UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
**------------------------------------------------------**X

JOSEPHINE CRUZ,                                   :

                        Plaintiff,            :

       - against -                          :

CAROLYN W. COLVIN,                               :
Acting Commissioner of Social Security,

                                            :

                    Defendant.           :

                                            :

**------------------------------------------------------**X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** 8/29/14

**REPORT AND**
**RECOMMENDATION**
**TO THE HONORABLE**
**WILLIAM H. PAULEY***

13cv1267-WHP-FM

**FRANK MAAS**, United States Magistrate Judge.

       Plaintiff Josephine Cruz ("Cruz") brings this action pursuant to Section

205(g) of the Social Security Act, as amended ("Act"), 42 U.S.C. §§ 405(g), 1383(c)(3),

to seek review of a final decision of the Commissioner ("Commissioner") of the Social

Security Administration ("SSA") denying her application for Supplemental Security

Income ("SSI") benefits.  The Commissioner has moved, and Cruz has cross-moved, for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure

("Rule 12(c)").  For the reasons set forth below, I recommend that the Commissioner's

motion (ECF No. 15) be granted, and that Cruz's motion (ECF No. 17) be denied.

---

       \*      Maybeline Saharig, a student at Seton Hall Law School, assisted in the
preparation of this Report and Recommendation.

I.    Background

    A.    Procedural History

On August 14, 2009, Cruz filed an application for SSI benefits alleging that she became disabled on January 1, 1998.  (R. 122-24).[1]  Cruz previously had sought and been denied benefits three times.  (Id. at 12).  After this latest application was denied on December 17, 2009, Cruz filed a written request for a hearing, which was granted.  (Id. at 55-59, 67-69).  Administrative Law Judge ("ALJ") Kenneth Scheer conducted the hearing on June 13, 2011.  (Id. at 28-48).  On September 12, 2011, ALJ Scheer denied Cruz's application for SSI benefits.  (Id. at 12-23).  Cruz sought review of the ALJ's decision, which the Appeals Council denied on December 20, 2012.  (Id. at 1-6, 8).  Cruz thereafter commenced this action on February 25, 2013.  (See ECF No. 2 ("Compl.")).  She has been represented by counsel in connection with her hearing before the ALJ, request for review by the Appeals Council, and this proceeding.  (R. 30, 100-01).

On March 5, 2013, Your Honor referred the case to me to report and recommend.  (ECF No. 3).  The Commissioner filed her motion for judgment on the pleadings on January 27, 2014.  (ECF No. 15).  Cruz then cross-moved on February 6, 2014.  (ECF No. 17).[2]  Cruz argues that the ALJ failed to apply the correct legal standard

---

[1]    "R." refers to the certified copy of the administrative record filed together with the Commissioner's Answer.  (ECF No. 9).

[2]    My scheduling order, as amended, contemplated only one motion with a reply by the Commissioner.  (See ECF Nos. 10, 13).  The Commissioner, however, has never responded to the cross-motion.

by failing to accord appropriate weight to the opinions of her treating physicians.  (ECF No. 18 ("Pl.'s Mem.")).  Cruz further argues that the ALJ's decision was not supported by substantial evidence and asks that the Commissioner's decision be reversed and the case remanded.  (Id.).  The Commissioner argues to the contrary that the ALJ's decision is supported by substantial evidence and should be affirmed.  (ECF No. 16 ("Comm'r's Mem.")).

II.      Relevant Facts

      A.      Non-Medical Evidence

            1.      Personal History

Cruz was born on June 30, 1971, in New York City.  (R. 35).  She attended school up until the ninth grade.  (Id.).  At the time of the hearing on June 13, 2011, she lived in an apartment with her three children who were twenty-two, nineteen, and fourteen years of age.  (Id. at 34).  Cruz was only five feet and one inch tall and weighed 179 pounds.  (Id. at 40).  She never had worked, and supported herself with public assistance.  (Id. at 35).  She claimed to have only one friend, but socialized with her brother and sister occasionally.  (Id. at 38).

At the hearing, Cruz testified that she had two herniated discs, suffered from muscle spasms, and experienced a sharp, aching pain in her buttocks that ran up and down her spine when she sat or stood for long periods of time.  (Id. at 36, 39).  Cruz also said she had problems walking because she had torn ligaments in her left knee.  She described the sensation in her knee as feeling as if it had "water in it" and noted that it

would swell.  (Id. at 36).  In addition to her troubles with sitting and standing, Cruz testified that her knee and back pain caused her difficulty in lifting and carrying.  (Id. at 39).  She stated that she could stand for up to twenty-five minutes without pain.  (Id.).

Cruz indicated that she suffered from asthma and allergies, as well as anxiety and depression.  (Id. at 37).  She testified that she was hospitalized in 2010 for four or five days due to bronchitis.  (Id.).  Cruz said that she occasionally felt that she did not want to rise from bed, and preferred to "lay in the bed and isolate [her]self from every one."  (Id. at 39).  Cruz also claimed that she experienced auditory hallucinations consisting of songs and people calling to her and knocking on her door.  (Id. at 37, 40).  Despite these symptoms, Cruz never was hospitalized for psychiatric issues.  (See id. at 37).

Cruz testified that notwithstanding her back and knee injuries, she could walk six to ten blocks, albeit slowly, and helped her children with cooking, cleaning, and shopping.  (Id. at 38-39, 42).  Cruz reported to a consulting physician that she enjoyed watching television and reading, was able to shower and dress herself, and did some cleaning, laundry, and shopping.  (Id. at 307).  At the hearing, she claimed that she had insomnia and therefore would take three to four naps lasting an hour or two each during the daytime.  (Id. at 40).

2.    Vocational Expert:  Raymond Cestar

Vocational expert Raymond Cestar ("Cestar") also testified at the hearing.  (Id. at 43-47).  According to Cestar, a person of Cruz's age and education, and with her

4

lack of past relevant work, who could perform the full range of light and sedentary work but was limited to "low stress, simple, repetitive tasks with no concentrated exposure to dust, fumes, gases, [or] extremes of heat and cold," could find work as a cafeteria attendant (DOT No. 311.677-010:  400,000 jobs nationally, 14,000 locally), assembler of small products (DOT No. 706.684-022:  230,000 jobs nationally, 2,500 locally), or mail clerk (DOT No. 209.687-026:  130,000 jobs nationally, 7,000 locally).  (Id. at 43-44). She also could be employed in such sedentary jobs as clerical worker (DOT No. 209.587-010:  109,000 jobs nationally, 9,000 locally), accounting clerk (DOT No. 205.367-014:  200,000 jobs nationally, 8,000 locally), or assembler (DOT No. 739.687-026:  225,000 jobs nationally, 2,000 locally).  (Id. at 44).

The ALJ also asked Cestar about the maximum time an employee could be "off task" due to her impairments while performing these jobs.  Cestar observed that five minutes per hour or one day per month were the maximums; otherwise, the person "would be considered to be unable to perform at a persistent pace and thus unlikely to meet quality standards or productivity norms on a sustained basis."  (Id.)

B.    Medical Evidence

1.    Physical Condition

a.    Treating Physician:  Dr. Angela Astuto

On February 3, 2011, Dr. Angela Astuto of Jacobi Hospital completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" at the request of Cruz's attorney.  (Id. at 37, 388-90).  Dr. Astuto determined that Cruz could lift or

carry up to ten pounds "occasionally."  (<u>Id.</u> at 388).  As support for this finding, Dr.

Astuto cited Cruz's complaints of back pain radiating to both legs and an MRI that she

described as showing degenerative changes at the L5-S1 disc space as well as disc

protrusion.  (<u>Id.</u>).

Dr. Astuto found that Cruz could stand and walk for a total of two hours in

an eight-hour day and for thirty minutes uninterrupted.  (<u>Id.</u> at 389).  She also opined that

Cruz could sit for a total of two hours in an eight-hour day and for only one hour without

interruption.  (<u>Id.</u>).  As support for these findings Dr. Astuto cited only the MRI report.

(<u>Id.</u>).

Dr. Astuto assessed that Cruz could never climb, stoop, kneel, balance,

crouch, or crawl, and that her ability to push or pull was affected by her impairments.

(<u>Id.</u>).  In support of these assessments Dr. Astuto stated that Cruz had a "history of left

knee pain due to gout and osteoarthritis," and that Cruz's back pain affected her ability to

push or pull.  (<u>Id.</u> at 388-89).

Dr. Astuto also noted that Cruz's physical impairments precluded her from

working in jobs that would expose her to heights, chemicals, humidity, vibration, moving

machinery, extreme temperature, fumes, and dust.  (<u>Id.</u> at 390).

The MRI report to which Dr. Astuto referred was not part of the

administrative record at the time of the hearing.  At the close of the hearing, ALJ Scheer

therefore requested that Cruz's attorney provide him with Dr. Astuto's records.  The ALJ

cautioned that those records were necessary for him "to give controlling weight to" the

doctor's opinions.  (Id. at 46).  Despite that admonition, the records have not been added
to the administrative record and appear never to have been submitted to the ALJ.

After the hearing, the ALJ subpoenaed Jacobi Hospital's records relating to
Cruz.  (Id. at 414).  The extensive records received relate mostly to Cruz's hysterectomy
in March 2011.  (See id. at 410-1080).  There are only passing references to Dr. Astuto.
(Id.).

b.    Treating Physician:  Jennifer M. Provataris

On February 5, 2010, Cruz saw Dr. Jennifer M. Provataris in the Jacobi
Hospital emergency room.  Cruz complained of left knee pain over the previous three
weeks at an intensity level of "7."  Although her knee was tender on palpation, her gait
was steady and there was no obvious swelling.  Dr. Provataris diagnosed her as having a
meniscal tear and gave her a referral to a sports medicine facility.  (Id. at 416-21).

c.    Treating Physical Therapist:  Dr. Imelda Cruz-Banting

Cruz began treatment with Dr. Imelda Cruz-Banting on May 3, 2002.  (Id.
at 354-55).  At that time, Dr. Cruz-Banting noted that Cruz's left knee had somewhat
limited range of motion and that Cruz had difficulty walking on her left heel and toes.
(Id. at 355).  On January 15, 2008, Cruz returned to Dr. Cruz-Banting complaining of
lower back pain for the previous three months.  (Id. at 358).  Dr. Cruz-Banting noted a
positive result on a straight-leg raising test on Cruz's left side.  (Id. at 359).  She also
indicated that Cruz had an antalgic gait, was using assistive devices, and could not walk
on her heels and toes.  (Id. at 358).  The doctor recommended that Cruz continue with

physical therapy.  (Id. at 359).  On August 26, 2008, Dr. Cruz-Banting noted effusion (the

collection of fluid) and moderate to severe tenderness in Cruz's left knee.  (Id. at 364).

During a follow-up visit on January 21, 2010, Cruz reported that her left knee had been

drained twice at the Jacobi Hospital emergency room.  (Id. at 350).

Dr. Cruz-Banting referred Cruz to Dr. David Payne, who performed an MRI

of Cruz's left knee on January 29, 2010.  (Id. at 347-48).  The MRI revealed moderate

osteoarthritis of the medial compartment and mild osteoarthritis of the lateral

compartment of the knee, as well as a shallow injury in the femur, lateral shift of the

patella with mild arthrosis, and articular cartilage thinning.[3]  (Id.).  Dr. Payne also noted a

tear of the medial meniscus, a partially extruded lateral meniscus with a tear of the

anterior and posterior horn, scarring of the ligament, joint effusion and anserine bursitis.[4]

(Id.).

On November 19, 2010, Dr. Cruz-Banting again examined Cruz and noted

an antalgic gait and restricted range of motion.  (Id. at 352).

d.   Treatment at St. Barnabas Hospital

Cruz was admitted to St. Barnabas Hospital in the Bronx on September 6,

2009.  She complained of shortness of breath and informed the staff that she had asthma.

---

[3]      Articular cartilage is "the cartilage covering the articular surfaces of the bones
participating in a synovial joint."  Stedman's Medical Dictionary (27th ed. 2000) ("Stedman's").

[4]      Anserine bursitis is an inflammation of the sac "between the tibial collateral
ligament of the knee joint and the tendons of the sartorius, gracilis, and semitendinosus
muscles."  Stedman's.

(Id. at 207-13).  Cruz was diagnosed with an acute asthma exacerbation and bronchitis.

(Id. at 213).  An x-ray revealed that Cruz's lungs were "well aerated" and showed "no

evidence of active pulmonary disease."  (Id. at 234).  Cruz was discharged from the

hospital on September 8, 2009.  (Id. at 213).

e.      Consulting Physician:  Dr. Sharon Revan

On November 30, 2009, Dr. Sharon Revan performed an internal medicine

examination of Cruz.  At the time, Cruz weighed 214 pounds.  Cruz reported that she was

able to shower and dress herself, although she sometimes needed help getting out of the

tub.  (Id. at 307).  She also stated that she mostly ate frozen dinners, and that she did some

cleaning, laundry, and shopping.  (Id.).

Cruz reported to Dr. Revan that her back pain was "intermittent, sharp,

[and] stabbing," and rated it 10 out of 10.  (Id. at 306).  Despite this, Dr. Revan reported

that Cruz's cervical spine had full flexion and extension, lateral flexion bilaterally, and

full rotary movement bilaterally.  (Id. at 308).  Cruz's "[l]umbar spine showed flexion to

75 degrees," full bilateral flexion, and full bilateral rotation, with pain on palpation.  (Id.

at 309).  A straight-leg raising test was negative bilaterally.  (Id.).  An x-ray of Cruz's

spine showed no "fracture, subluxation, or disc thinning," but did reveal facet

arthropathy[5] of Cruz's lower lumbar spine.  (Id. at 309, 311).

---

[5]      Facet arthropathy, also known as facet joint osteoarthritis, is "a degenerative disease that affects the joints of the spine and the disintegration of cartilage on those joints. . . . [It] is the result of normal, age-related degeneration."  Laser Spine Institute, Facet Joint Arthropathy, https://www.laserspineinstitute.com/back_problems/facet_disease/articles/

(continued...)

Cruz also reported to Dr. Revan that her left knee pain was intermittent and "burning" and rated it 10 out of 10.  (Id. at 306).  Nonetheless, Cruz maintained full range of motion bilaterally in her knees and ankles, and the joints were stable and not tender.  (Id. at 309).  Cruz had no subluxations,[6] contractures, ankylosis,[7] thickening, effusion,[8] redness, heat, swelling, or muscle atrophy.  (Id.).  Her strength was "5/5" in both her upper and lower extremities.  (Id.).

In her report, Dr. Revan assessed Cruz's general appearance, gait, and station.  Cruz appeared to be in "no acute distress," her gait and stance were normal, and she was able to squat halfway and walk on her heels and toes without difficulty.  Cruz needed no help getting on or off the exam table and could rise from a chair without difficulty.  (Id. at 308).  In Dr. Revan's opinion, Cruz had "mild" limitations in sitting, standing, and lying down due to back pain; "mild" limitations in walking due to knee pain; and "moderate" limitations in climbing stairs due to back and knee pain.  (Id. at 309-10).  Moreover, Dr. Revan found no limitation in Cruz's upper extremities for fine and gross motor activity.  (Id. at 309).  Dr. Revan described Cruz's prognosis as fair.  (Id.).

---

[5](...continued)
facet_joint_arthropathy/ (last visited Aug. 28, 2014).

[6]      Subluxation is "[a]n incomplete luxation or dislocation."  Stedman's.

[7]      Ankylosis is the "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint."  Stedman's.

[8]      Effusion is "[t]he escape of fluid from the blood vessels or lymphatics into the tissues or a cavity."  Stedman's.

f.      Consulting Physician:  Dr. M. Maximowicz

On December 16, 2009, Dr. M. Maximowicz completed a Physical Residual

Functional Capacity Assessment for Cruz.  (Id. at 322-27).  Dr. Maximowicz listed

Cruz's primary diagnosis as asthma, and her secondary diagnosis as "back disorder."  (Id.

at 322).  He opined that Cruz could occasionally lift or carry up to twenty pounds and

could frequently lift or carry up to ten pounds.  (Id. at 323).  He believed Cruz could

stand, walk, or sit for a total of six hours in an eight-hour work day, and that her ability to

push or pull was unlimited.  (Id. at 323).  Dr. Maximowicz found that Cruz had no

postural, manipulative, visual, or communicative limitations, but that she should avoid

concentrated exposure to respiratory irritants.  (Id. at 324-25).

2.      Mental Condition

a.      Fordham-Tremont Community Health Center

Cruz received treatment for her mental health issues at the Fordham-

Tremont Community Health Center from 2005 through March 2011.  (Id. at 235-305;

392-409).  In a Treatment Plan Review ("TPR") dated January 12, 2009, Cruz's mental

health diagnosis was listed as Major Depressive Disorder with Psychotic Features, and

she was assigned a GAF score in the range of 61 to 70.  (Id. at 248-49).  Her clinician

noted that the GAF score "expected at [d]ischarge" was 75.[9]  Cruz's depressive symptoms

---

[9]      The GAF scale was a numeric scale ranging from 0 to 100 that clinicians could use to rate a patient's social, occupational, and psychological functioning.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) ("DSM-IV-TR").  The scale was introduced in the revised version of the DSM's third edition, id.

(continued...)

were assigned a severity of seven, and her auditory hallucinations were assigned a

severity of five on a ten-point scale.  A TPR completed in April 2009 showed little

change in Cruz's condition.  (Id. at 250-51).  On July 9, 2009, Cruz reported an increase

in her depressed mood and daily auditory hallucinations, as well as reduced sleep.  Her

depressive symptoms were assigned a severity of ten, and her auditory hallucinations

remained at five.  (Id. at 252).  Her GAF score was listed at 60, with an expected score of

65.[10]  She was receiving individual therapy and medication management services on a

monthly basis, and was prescribed Paxil, Abilify, and Remeron.[11]  (Id. at 252-53).

A TPR completed on October 5, 2009, showed little change in Cruz's

condition.  She described the auditory hallucinations as "knocking on the door when no

one is there."  (Id. at 254).  At that time, she attributed an increase in her depressive

---

[9](...continued)
at 12 (3d ed., rev.1987), but was removed from the most recent edition, which was released in
2013, id. at 16 (5th ed. 2013) ("DSM-5").  A GAF in the 61 to 70 range reflects "some mild
symptoms" such as "depressed mood" or "mild insomnia," or "some difficulty in social,
occupational, or school functioning," but the individual would be expected generally to be
"functioning pretty well."  DSM-IV-TR at 34.  A GAF score of 75 would indicate that "[i]f
symptoms are present, they are transient" and the individual has "no more than slight impairment
in social, occupational, or school functioning."  Id.

[10]       A GAF in the 51 to 60 range reflects the presence of "[m]oderate symptoms" such
as "flat affect and circumstantial speech, [or] occasional panic attacks" or "moderate difficulty in
social, occupational, or school functioning."  Id.  A GAF score of 65 would reflect "some mild
symptoms" such as "depressed mood" or "mild insomnia," or "some difficulty in social,
occupational, or school functioning," but would indicate that the individual was "generally
functioning pretty well."  Id.

[11]       Paxil and Remeron both are drugs indicated for treatment of anxiety and
depression.  Attorneys Medical Deskbook § 39:8 (4th ed. 2013).  Abilify is indicated for
treatment of " bipolar disorder, dementia, manic symptoms, schizophrenia, other psychosis."  Id.

symptoms to "family stressors."  (<u>Id.</u>).  Her GAF score remained at 60, and her depressive symptoms remained at ten out of ten.  Her clinician increased her dosage of Paxil.  (<u>Id.</u> at 255).

On January 5, 2010, Cruz's GAF score and symptom intensity remained static.  She reported having lost 16 pounds due to a decrease in her appetite, which she "attribute[d] to depressed mood."  (<u>Id.</u> at 392).  Her clinician added Cymbalta[12] to her drug regimen.  (<u>Id.</u> at 393).

A TPR completed on April 5, 2010, revealed that Cruz's depressive symptoms had decreased in intensity to an eight on the ten-point scale, and the intensity of her auditory hallucinations had decreased to six.  (<u>Id.</u> at 394).  On July 1, 2010, Cruz's symptoms remained largely unchanged, although the intensity of her auditory hallucinations had lessened to a three out of ten.  (<u>Id.</u> at 396).  She reported bathing on a daily basis and feeling increased motivation to perform daily chores.  (<u>Id.</u>).  Cruz continued to receive monthly individual therapy and medication management.  (<u>Id.</u>).

On July 20, 2010, Cruz reported that she had gone on a trip to Puerto Rico, and had been feeling "less depressed since" returning.  (<u>Id.</u> at 407).  She noted that "all the children [we]re doing their own laundry" by that time, so she only did her own, and that she had been bathing on a daily basis.  (<u>Id.</u>).  On February 8, 2010, Cruz reported doing well on medications, felt less depressed, was relaxed, and had been sleeping well.

---

[12]     Cymbalta also is indicated for treatment of anxiety and depression.  <u>Id.</u>

(Id. at 408).  Her condition remained relatively unchanged over the following months.
(Id. at 409).

                   b.        Treating Psychiatrist:  Dr. Michel-Ange Camille

            On March 1, 2011, Dr. Michel-Ange Camille, Cruz's treating psychiatrist,
completed a wellness plan for Cruz at the request of the New York City Human
Resources Administration.  He noted that her current diagnoses were major depressive
disorder with schizophrenia and major depressive disorder with psychotic features.  (Id. at
379).  He described her as "[a]ppropriately groomed and dressed," cooperative, having
good eye contact, logical and coherent speech, and being oriented times three, but with
flat affect.  (Id.).  Dr. Camille stated further that Cruz had made "little progress" in
decreasing her depressed mood and increasing her motivation, and concluded that she
was unable to work for at least twelve months.  (Id. at 380).

            On March 8, 2011, Dr. Camille completed a "Medical Assessment of
Ability to Do Work-Related Activities (Mental)."  Dr. Camille assessed that Cruz had
poor or no ability to follow work rules, interact with co-workers, supervisors, or the
public, deal with work stresses, function independently, and maintain attention and
concentration.  (Id. at 381).  Dr. Camille also opined that Cruz had poor or no ability to
deal with simple or complex job instructions, maintain personal appearance, relate
predictably in social situations, or demonstrate reliability.  (Id. at 382).  He rated her
abilities to behave in an emotionally stable manner and use judgment as "fair."  (Id. at

14

381-82).  In several spaces where he was asked to "provide the medical/clinical findings" that supported his assessment, Dr. Camille set forth no information.  (Id. at 382-83).

c.   Treating Social Worker:  Lauren Levy

On February 1, 2011, social worker Lauren Levy filled out a psychiatric assessment for Cruz.  Levy indicated that Cruz had been a client at "AOC" (the Adult Outpatient Clinic at the Fordham-Tremont Community Mental Health Center) since August 22, 2005.  (Id. at 376).  Levy found Cruz to be "appropriately dressed," although her hair was "somewhat disheveled."  (Id.).  Cruz was cooperative during her interview with Levy, and her attention and concentration were "fair."  Levy found Cruz's recent memory to be intact, although her remote memory was "poor."  Her speech was "clear and coherent," and Cruz exhibited average intelligence.  (Id.).  Although Cruz's mood and affect were "depressed," she showed fair social judgment and "fair to good" relatedness.  (Id.).

Levy listed Cruz's diagnoses as major depressive disorder with psychotic features, arthritis, asthma, and anemia.  She assigned Cruz a GAF score of 55, and noted that Cruz received one or two thirty-minute individual therapy sessions per month.  (Id. at 377).  Levy opined that Cruz's "consistent apathy regarding treatment goals ma[de] it difficult for her to make progress" and that her "lack of motivation on a consistent basis for such a long time [led] to a poor prognosis."  (Id.).

15

d.      Consulting Psychologist:  Dr. Dmitri Bougakov

On November 30, 2009, Dr. Bougakov performed a consultative psychiatric evaluation of Cruz.  Cruz came to the examination casually dressed.  (Id. at 312-13).  She displayed some restlessness and leg shaking, but her eye contact was appropriate.  (Id.).  Her thought processes were coherent and goal directed, although her mood was dysthymic.[13]  She was oriented to person and place but not time, and could count and do simple math, but was impaired on serial threes.  (Id. at 313).  Her memory skills were mildly impaired due to anxiety, and her intellectual functioning was in the average to below average range.  (Id. at 313-14).

Cruz reported that she was able to dress, bathe, and groom herself and would cook, clean, do laundry, and shop on a limited basis.  She also could manage her money.  (Id. at 314).

Dr. Bougakov diagnosed Cruz with "[m]ajor depressive disorder with some psychotic features" and anxiety disorder.  (Id. at 314).  Dr. Bougakov indicated that Cruz had "some limitations" in her ability to deal with others and with stress, and that her psychiatric problems "may significantly interfere with [her] ability to function on a daily basis."  (Id.).  Dr. Bougakov also noted that Cruz was somewhat limited in her ability to

---

[13]      "Dysthymic" relates to "dysthymia," a "chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms:  poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  Stedman's.

maintain a regular schedule, learn new tasks, and maintain attention and concentration. (Id.).

Dr. Bougakov also found, however, that Cruz could perform simple and complex tasks, make appropriate decisions, and follow and understand simple directions and instructions. (Id.). Dr. Bougakov recommended that Cruz continue psychological and psychiatric treatment. (Id. at 315). He described her prognosis as "guarded." (Id.).

e.    Consulting Psychiatrist:  Dr. Altmansberger

On December 16, 2009, Dr. Altmansberger, a state agency psychiatrist, completed a Psychiatric Review Technique for Cruz. (Id. at 316-21). Dr. Altmansberger indicated that Cruz suffered from affective disorders and anxiety-related disorders. (Id. at 316). He noted that Cruz had "moderate" restriction in her activities of daily living and maintaining social functioning and concentration, persistence, or pace. (Id. at 319). Nevertheless, he concluded that Cruz did not meet the diagnostic criteria for the Listings for affective disorders (12.04) or anxiety related disorders (12.06). (Id. at 317-20).

C.    ALJ's Decision

On September 12, 2011, the ALJ denied Cruz's application for SSI benefits, finding that Cruz was not disabled within the meaning of the Act. (Id. at 9-23). In reaching that conclusion, the ALJ applied the five-step sequential analysis required by 20 C.F.R. § 404.1520.

17

1.      Step One

At Step One, the ALJ found that Cruz had not engaged in substantial gainful activity ("SGA") since August 14, 2009, the date of her application.  (Id. at 14).

2.      Step Two

At Step Two, the ALJ found that Cruz had severe impairments that "cause[d] more than minimal functional limitations" as a result of her lower back and left knee pain, asthma, and depression.  (Id.).

3.      Step Three

At Step Three, the ALJ found that Cruz did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments ("Listings") in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  (Id. at 15). Specifically, the ALJ considered whether Cruz's impairments satisfied the criteria for Listings 1.02 ("Major dysfunction of a joint(s)"), 1.04 ("Disorders of the spine"), 3.03 ("Asthma"), 12.04 ("Affective Disorders"), and 12.06 ("Anxiety Related Disorders").

With respect to Cruz's knee pain, the ALJ considered Listing 1.02.  He concluded that the medical evidence failed to "demonstrate a level of severity required to meet the criteria" of that Listing.  The ALJ noted that the Listing required "imaging studies showing joint space narrowing, bony destruction, or ankylosis, plus the inability to ambulate effectively."  (Id.).  As he explained elsewhere in his decision, an x-ray of Cruz's left knee in August 2008 "indicated normal joint spaces and alignment, no evidence of fracture, and unremarkable results."  (Id. at 17).  An MRI of the left knee in

18

January 2010 showed only "moderate medial and mild lateral osteoarthritis and mild arthrosis of the patella." (Id.).

The ALJ analyzed Cruz's back pain under Listing 1.04. He noted that this Listing required "a disorder of the spine, resulting in compromise of a nerve root or the spinal cord with either evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." (Id. at 15). Here again, he found that the record evidence did not demonstrate the requisite "level of severity." (Id.). As he stated elsewhere, the MRI of Cruz's spine "revealed only disc protrusion at L5-S1 and mild narrowing of the spinal cord." (Id. at 17).

The ALJ also analyzed Listing 3.03 related to asthma, concluding that Cruz's condition did not satisfy that Listing because her asthma had not "resulted in the prescribed number of attacks." (Id. at 15).

In assessing Cruz's anxiety and depression, the ALJ considered Listings 12.04 ("Affective Disorders") and 12.06 ("Anxiety Related Disorders"). (Id. at 15-16). Particularly, the ALJ considered whether the "paragraph B" criteria of those Listings were satisfied. In order to satisfy paragraph B of both Listings, Cruz's mental impairments would have to have resulted in at least two of the following: marked restrictions of daily activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Id. at 15).

The ALJ concluded that Cruz had "at most, moderate limitations in activities of daily living" and was "able to attend to self-care tasks, cook, clean, shop, . . . negotiate public transportation independently[,] . . . [and] care[] for her children." (Id.). The ALJ also found that Cruz had "moderate difficulties" in social functioning, noting that she was able to socialize with friends and talk to them on the phone. (Id.). In support of his conclusions, the ALJ cited Dr. Bougakov's observations that Cruz was cooperative and had "an adequate manner of relating, appropriate eye contact, fluent speech, and adequate expressive and receptive language." (Id.).

The ALJ found that Cruz also had only "moderate difficulties" in maintaining concentration, persistence, or pace because she was able to watch television and read. (Id. at 16). The ALJ opined that these activities "suggest[ed] an ability to concentrate on at least a basic level." (Id.). The ALJ also noted Dr. Bougakov's observation that Cruz "exhibited coherent and goal directed thought processes with no evidence of hallucinations, delusions, or paranoia," and Dr. Altmansberger's assessment that Cruz was "not significantly limited in her ability to understand, remember and carry out short and simple instructions." (Id.).

The ALJ also noted that Cruz had experienced no episodes of decompensation of extended duration. (Id.).

After considering all these factors, the ALJ concluded that the "paragraph B" criteria were not satisfied because Cruz failed to demonstrate "at least two 'marked'

limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  (Id.).

The ALJ also found that "the evidence fail[ed] to establish the presence of the 'paragraph C' criteria."  (Id.).

For these reasons, the ALJ concluded that Cruz's impairments did not meet or medically equal any of the Listings.

4. Step Four

At Step Four of the analysis, ALJ Scheer determined that Cruz had the RFC to "perform sedentary work," except that she was limited to "low stress, simple, repetitive tasks performed in an environment with no concentrated exposure to dusts, fumes, gases, and extremes of  heat and cold."  (Id.).  In coming to this conclusion, the ALJ first "determined whether there [was] an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce [Cruz's] pain or other symptoms."  (Id. at 16-17).  The ALJ then "evaluate[d] the intensity, persistence, and limiting effects of [Cruz's] symptoms to determine the extent to which they limit[ed] her] functioning."  (Id. at 17).  Through this two-step process, the ALJ concluded that Cruz's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Cruz's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not credible" to the extent they conflicted with his RFC assessment.  (Id.).

a.    Assessment of Doctors' Opinions

The ALJ described the weight he accorded to the various medical opinions in the record in arriving at his RFC determination.  He accorded "significant weight" to the opinions of Drs. Revan and Bougakov, the consulting examiners, because they were supported by the evidence in the record and findings upon evaluation.  (Id. at 20).  He declined to assign controlling weight to Dr. Astuto's assessment that Cruz was "unable to perform even sedentary work" as that opinion was "not supported by any treatment documentation."  (Id. at 18).  He further noted that the additional records received from Jacobi Hospital related to a laproscopic abdominal procedure, not back or knee problems, but that even those indicated "no obvious difficulties with the musculoskeletal system and no muscle weakness."  (Id.).  The ALJ did not discuss the report of consultant Dr. Maximowicz.

Regarding Cruz's mental status assessment, the ALJ accorded "weight" to Dr. Altmansberger's assessments "as they [we]re consistent with the opinion of Dr. Bougakov."  (Id. at 20-21).  However, the ALJ did not accord "controlling or significant weight" to Dr. Camille's opinions, noting that his opinions also were "unsupported by medical evidence," and that his assessment that Cruz was disabled was "not a medical issue but an issue reserved to the Commissioner."  (Id. at 20 (citing 20 C.F.R. § 416.927(e), SSR 96-5p)).

b.     Assessment of Cruz's Credibility

In support of his conclusion that Cruz's "statements concerning the

intensity, persistence and limiting effects of [her] symptoms [were] not credible to the

extent they" conflicted with his RFC assessment, the ALJ noted several contradictions in

Cruz's testimony.  (Id. at 17, 20).  For instance, the ALJ pointed out that Cruz appeared to

have exaggerated when she claimed that she suffered from disc herniation, as the MRI

described by Dr. Astuto showed only "minimal degenerative changes" manifesting in

"only disc protrusion."  (Id. at 20).  Moreover, the ALJ noted that even though Cruz

complained of "severe and debilitating back pain," she told the consultative examiner that

the pain was alleviated through the use of only Aleve, an over-the-counter medicine, and

a heating pad.  (Id.).  The ALJ also noted that Cruz's admitted daily activities, such as

watching television and participating in self-care tasks, contradicted her assertions of

disability.  (Id.).  Finally, the ALJ concluded that her claimed severe mental illness was

inconsistent with the fact that "she was well enough to go on vacation and travel for a few

weeks in mid 2010."  (Id.).

5.     Step Five

At Step Five, the ALJ considered Cruz's age, education, lack of work

experience, and RFC, to determine whether "there are jobs that exist in significant

numbers in the national economy that [Cruz] can perform."  (Id. at 21).  To satisfy that

inquiry, the ALJ first consulted the Medical-Vocational Guidelines, 20 C.F.R. Part 404,

Subpart P, Appendix 2, often referred to as the "Grids."  The ALJ noted that the Grids

ordinarily direct a finding of nondisability for a claimant who can perform sedentary work.  (Id.).  Because Cruz had additional limitations, however, the ALJ relied on the testimony of vocational expert Cestar, who stated that a hypothetical worker of Cruz's age, education, work experience, and RFC could find work as a clerical worker (109,000 jobs nationally, 9,000 locally), an account clerk (200,000 jobs nationally, 8,000 locally), and an assembler (225,000 jobs nationally, 2,000 locally).  (Id. at 22).  The ALJ also observed that Cestar's testimony was consistent with the information in the Dictionary of Occupational Titles ("DOT").  (Id. (citing SSR 00-4p (ALJ must consider whether a conflict exists between the vocational expert's testimony and the information in the DOT))).

Based on the finding that there was work that Cruz could perform, the ALJ concluded that Cruz was "not disabled" under the Act during the relevant period, which began on August 14, 2009, when her latest application was filed.  (Id.).

III.    Applicable Law

A.    Standard of Review

Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. See Hickson v. Astrue, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

B.   Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A). "[W]hether a claimant is disabled or unable to work is a matter reserved

for the Commissioner." Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL

1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527(e)). In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920. The Second

Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If [s]he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits h[er] physical or
> mental ability to do basic work activities. If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on
> medical evidence, the claimant has an impairment which is
> listed in Appendix 1 of the regulations. If the claimant has such
> an impairment, the [Commissioner] will consider h[er] disabled
> without considering vocational factors such as age, education,
> and work experience. . . . Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, [s]he has the residual functional
> capacity to perform h[er] past work. Finally, if the claimant is
> unable to perform h[er] past work, the [Commissioner] then
> determines whether there is other work which the claimant could
> perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof with respect to the first four steps of

the five-step process. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

26

process, she is not required to proceed with any further analysis.  20 C.F.R.

§ 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  However, if the

analysis reaches the fifth step of the process, the burden shifts to the Commissioner to

show that the claimant is capable of performing other work.  Poupore v. Astrue, 566 F.3d

303, 306 (2d Cir. 2009).

        In assessing whether a claimant has a disability, the factors to be considered

include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on

such facts; (3) subjective evidence of pain or disability testified to by the claimant or

other[s]; and (4) the claimant's educational background, age, and work experience."

Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).  When reviewing the medical

evidence, the ALJ has the authority to select among conflicting opinions.  Veino, 312

F.3d at 588; see Richardson, 402 U.S. at 399.  Thus, if there are genuine conflicts within

the evidence, their resolution is a matter committed to the Commissioner's discretion.

See Dwyer v. Astrue, 800 F. Supp. 2d 542, 550 (S.D.N.Y. 2011) (citing Veino, 312 F.3d

at 588).

        Although the ALJ is required to follow the five-step sequential analysis and

consider the above factors in making the disability determination, the ALJ need not state

explicitly the reasoning for each step of the analysis.  "[T]he absence of an express

rationale for an ALJ's conclusions does not prevent [a court] from upholding them so

long as [the court is] 'able to look to other portions of the ALJ's decision and to clearly

credible evidence in finding that his determination was supported by substantial

evidence.'" <u>Salmini v. Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 112 (2d Cir. 2010) (quoting <u>Berry</u>, 675 F.2d at 469).

  C. <u>Treating Physician Rule</u>

    The "treating physician rule" requires an ALJ "to grant controlling weight to the opinion of the claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence." <u>Rosado v. Barnhart</u>, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). As the Second Circuit has explained, a treating physician's opinion is typically accorded special consideration because of the "continuity of treatment he provides and the doctor/patient relationship he develops" with the claimant, which "place[s] him in a unique position to make a complete and accurate diagnosis of his patient." <u>Monegur v. Heckler</u>, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

    Nonetheless, the Commissioner need not grant "controlling weight" to a treating physician's opinion as to the ultimate issue of disability, as this decision lies exclusively with the Commissioner. <u>See</u> 20 C.F.R. § 404.1527(d)(1); <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). The Second Circuit also has acknowledged that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence and the report of a consultative physician may constitute such evidence." <u>Monegur</u>, 722 F.2d at 1039 (internal citations omitted). A "treating physician's retrospective diagnosis . . . is entitled to controlling weight <u>unless</u> it

is contradicted by other medical evidence or 'overwhelmingly compelling' non medical evidence." Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003) (citing Rivera v. Sullivan, 923 F.2d 964, 968 (2d Cir. 1991) (emphasis added)).  The Commissioner must, however, always provide "good reasons" for the weight, if any, he gives to the treating source's opinion.  20 C.F.R. § 404.1527(c)(2).  If the ALJ fails to apply the correct standard in weighing a treating physician's opinion or fails to give good reasons for rejecting the opinion, a remand for further fact finding is the appropriate remedy. Halloran, 362 F.3d at 33; Dudelson v. Barnhart, No. 03 Civ. 7734 (RCC) (FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10, 2005) (citing Schaal, 134 F.3d at 506).

> D.    Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks, ellipsis, and brackets omitted).  Indeed, an ALJ's failure to adequately develop the record is an independent ground for vacating his decision and remanding the case.  (Id. at 114-15).  When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information.  Schaal, 134 F.3d at 505; Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010).  The ALJ may do this by requesting copies of the claimant's medical source's records, a new report, or a more detailed report.

Jimenez v. Colvin, No. 11 Civ. 4599 (DRH), 2013 WL 1332630, at *8 (E.D.N.Y. Mar. 31, 2013). Although the duty to develop the record fully is heightened when a claimant is proceeding pro se, the ALJ has a duty to do so even when a claimant, such as Cruz, has counsel. Moran, 569 F.3d at 112.

The ALJ's duty to develop the record "works in tandem" with the treating physician rule. Rosado, 290 F. Supp. 2d at 438 (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)). Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is "all the more important." Miller v. Barnhart, No. 03 Civ. 2072, 2004 WL 2434972, at *7 (S.D.N.Y. Nov. 1, 2004); see also Rosado, 290 F. Supp. 2d at 438 (quoting Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)) ("To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of a[n] examining physician who sees the claimant once and who performs the same tests and studies as the treating physician"). Therefore, while a "treating physician's statement that the claimant is disabled cannot itself be determinative[,] . . . failure to develop conflicting medical evidence from a treating physician is legal error requiring remand." Miller, 2004 WL 2434972, at *8 (citing Snell, 177 F.3d at 133, and Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)).

IV.    <u>Analysis</u>

The question presented by the cross-motions is whether the ALJ's decision that Cruz was not disabled within the meaning of the Act since August 14, 2009, is legally correct and supported by substantial evidence.  Cruz seeks reversal of the ALJ's decision principally on the ground that the ALJ improperly rejected the opinions of her treating physicians.  (Pl.'s Mem. at 11).  The Commissioner disputes this assertion, contending that the ALJ applied the appropriate legal standards and reached determinations that are supported by substantial evidence.  (Comm'r's Mem. at 16-25).

A.    <u>Step One</u>

The first step of the sequential analysis requires the ALJ to determine whether the claimant has engaged in substantial gainful activity during the period at issue. 20 C.F.R. § 404.1520(a)(4)(i).  The ALJ determined that Cruz had not engaged in substantial gainful activity since August 14, 2009, the date of her disability application. (R. 14).  This finding, of course, is consistent with the evidence and Cruz's testimony that she never worked.  (<u>Id.</u> at 35).

B.    <u>Step Two</u>

The second step of the sequential analysis requires the ALJ to assess the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The ALJ does not consider the claimant's age, education, or work experience at this step.  <u>Id.</u>

31

Here, the ALJ determined that Cruz's lower back and left knee pain, asthma, and depression constituted severe impairments.  (R. 14).  These findings benefitted Cruz since they allowed her to proceed to the third step, and are consistent with the record evidence.

C.    Step Three

The third step calls for the ALJ to determine whether the claimant has an impairment listed in Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ is required to base this determination solely on medical evidence, without regard to the claimant's age, education, or work experience.  20 C.F.R. § 404.1520(d).  If the ALJ finds that the claimant has an impairment that meets or equals a Listing in Appendix 1, the claimant is considered disabled within the meaning of the Act.  20 C.F.R. § 404.1520(a)(4)(iii), (d).

Here, the ALJ examined the medical records, giving special consideration to the listings for "musculoskeletal disorders" (1.00), "asthma" (3.03), and "mental disorders" (12.00), and determined that Cruz's condition did not meet or medically equal any of these listings.  (R. 15).  Cruz does not appear to dispute this aspect of the ALJ's decision.  Moreover, a review of Cruz's medical history in conjunction with Appendix 1 confirms that the ALJ's conclusion is supported by substantial evidence.

1.    Musculoskeletal Disorders

a.    Joint Disorders:  Section 1.02

Section 1.02 of Appendix 1 relates to major dysfunction of a joint due to any cause.  To meet this Listing, a claimant must demonstrate, insofar as relevant,

32

involvement of "one major peripheral weight-bearing joint" such as a hip, knee, or an ankle, "resulting in inability to ambulate effectively."  See Appendix 1 § 1.02(A).  To ambulate effectively, a claimant must be able to "sustain[] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  Id. § 1.00(B)(2)(b).  The joint dysfunction must be characterized by a "gross anatomical deformity," such as "subluxation, contracture, bony or fibrous ankylosis, instability," along with signs of limitation of motion or other abnormal motion of the affected joint(s), imaging studies showing joint spaces narrowing, bony destruction, or ankylosis.  Id. § 1.02.

An MRI of Cruz's left knee taken in January 2010 revealed moderate deterioration of the medial and mild deterioration of the lateral compartment of the knee.  (R. 347-48).  The MRI also showed a shallow injury in the femur, lateral shift of patella with mild arthrosis, and thinning of the cartilage covering the articular surfaces of the bones.  (Id.).  These mild injuries were consistent with an x-ray of Cruz's left knee performed in 2008 that showed normal joint spaces and alignment, normal soft tissue, and no evidence of fracture.  (Id. at 203).  Thus, there was no evidence of "gross anatomical deformity."  Moreover, Cruz's testimony that she was able to walk between six and eight blocks constituted substantial evidence that she was able to ambulate effectively.  (Id. at 39).

b.  Spine Disorders:  Section 1.04

Section 1.04 of Appendix 1 relates to disorders of the spine, including degenerative disc disease.  See Appendix 1 § 1.04.  Spinal disorders require evidence of

33

either (i) "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss" and, if the injury involves the lower back, a "positive straight-leg raising test"; (ii) spinal arachnoiditis confirmed by medical tests or imaging, which results in the need to change positions more than once every two hours; or (iii) lumbar spinal stenosis, which results in an inability to ambulate effectively.  Id.

Cruz's lower back complaints did not meet this definition.  Turning to the first of these alternatives, the medical evidence showed that Cruz experienced some limitation in the range of motion of her spine, but she retained 5/5 strength in her extremities, indicating no atrophy.  (R. 309).  Further, although Dr. Cruz-Banting noted a positive result on a straight-leg raising test on Cruz's left side in 2008, Dr. Revan's 2009 straight-leg raising test was negative.  (See id. at 309, 359).  As to the second alternative, although Dr. Astuto indicated that an MRI report supported her determinations regarding how long Cruz could stand or walk, no MRI of Cruz's spine appears in the record.  Further, there is no evidence in the record indicating that Cruz needed to change position more than once every two hours.  Finally, under the third alternative, Cruz's ability to walk six to ten blocks, clean, do laundry, cook, and take public transportation constituted substantial evidence that she remained able to ambulate effectively.   (Id. at 38-39, 42, 323, 330).

34

2.      Asthma:  Section 3.03

Section 3.03 of Appendix 1 relates to disorders of the respiratory system such as asthma.  To satisfy section 3.03, a claimant must show that she suffers from either (a) "[c]hronic asthmatic bronchitis"; or (b) attacks, "in spite of prescribed treatment and requiring physician intervention, occurring at least once every [two] months or at least six times a year.  Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks."  Id. § 3.03(A), (B).  Asthmatic attacks are defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting."  Id. § 3.00(C).

Cruz's condition did not satisfy this Listing.  There is no evidence in the record that Cruz had chronic asthmatic bronchitis.  Rather, as the ALJ accurately indicated, Cruz's asthma was characterized as a "moderate, persistent type [that] has generally been described as being well controlled with medication."  (R. 17).  Moreover, a chest x-ray performed in September 2009 revealed "no evidence of active pulmonary disease."  (Id. at 234).  Although she was hospitalized once for two days for asthma and bronchitis, Cruz also did not experience the prescribed number of attacks.  Indeed, at the time of the hearing in June 2011, Cruz apparently had not been to the emergency room due to her asthma since September 2009, almost two years earlier.

35

3.     Mental Disorders:  Sections 12.04 and 12.06

Mental disorders are listed in Appendix 1, Section 12.00.  The impairments potentially relevant to Cruz's condition are (a) affective disorder, "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," id. § 12.04, and (b) anxiety-related disorders, in which anxiety is the "predominant disturbance," id. § 12.06.

Section 12.04 is satisfied when the requirements of both paragraphs A and B or paragraph C are met.  To fulfill the requirements of paragraph B, the claimant must experience at least two of the following limitations:  marked restriction of daily activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  Id. § 12.04(B).  Paragraph C is fulfilled when there is a medical history of a "chronic affective disorder of at least [two] years' duration that has caused more than minimal limitation" in the performance of basic work activities and one of the following:  "[r]epeated episodes of decompensation, each of extended duration;" a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or a history of one or more years of "inability to function outside a highly supportive living environment."  Id. § 12.04(C).

Section 12.06 is satisfied when the requirements in both paragraphs A and B are met, or when the requirements in both paragraphs A and C are met.  The section

12.06 paragraph B criteria are the same as the paragraph B criteria under section 12.04.

The paragraph C criteria require that the claimant's disorder result "in complete inability

to function independently outside the area of one's home."  <u>Id.</u> § 12.06(C).

Here, there is substantial evidence to support the conclusion that Cruz failed

to meet the paragraph B criteria for either section as Cruz had no "marked" restrictions

and experienced no episodes of decompensation.  (<u>See</u> R. 15).  Dr. Revan reported that

Cruz showered and dressed herself and was able to clean, do laundry, shop, watch

television, and read, all of which supports a conclusion that she was not markedly limited

in her activities of daily living.  (<u>See id.</u> at 307).  Cruz testified that she had one friend,

and spent time with her brother and sister.  (<u>Id.</u> at 38).  Additionally, Dr. Altmansberger

found that Cruz was "not significantly limited" in her ability to interact appropriately with

the public, maintain socially-appropriate behavior, or adhere to basic standards of

neatness, a finding that is corroborated by Dr. Bougakov's assessment that Cruz had only

"some limitations" in her ability to deal with others, and Levy's description of Cruz as

"appropriately dressed" and cooperative.  (<u>See id.</u> at 314, 329, 376).  These findings all

support the conclusion that any limitations Cruz had with regard to social functioning

were less than marked.  Cruz's ability to watch television and read, as well as Dr.

Bougakov's assessment that Cruz's thought processes were coherent and goal-directed,

and that she was only "somewhat limited" in her ability to maintain attention and

concentration, lend support to the conclusion that Cruz was less than markedly limited in

her ability to maintain concentration, persistence or pace.  (<u>See id.</u> at 307, 314).  Finally,

Cruz testified that she never had been hospitalized for her anxiety or depression, indicating that she had not experienced any episodes of decompensation.  (See id. at 37).

The evidence also failed to establish the paragraph C criteria for either section.  See Appendix 1 § 12.04(C); 12.06(C).  With regard to Section 12.04, there was no evidence in the record to suggest that Cruz suffered from (a) "[r]epeated episodes of decompensation" of "extended duration," (b) a "residual disease process," or (c) an "inability to function outside a highly supportive living environment."  See Appendix 1 § 12.04(C).  As noted previously, Cruz never had been hospitalized for her anxiety or depression, and she testified that she lived at home with her three children, not in any kind of supportive living environment.  (See R. 34).  With regard to Section 12.06, there was no evidence to suggest that Cruz could not function outside of her home.  See Appendix 1 § 12.06(C).  Indeed, she was able to shop, travel to doctor's appointments, and use public transportation.  (See R. 157-58; 307).

Thus, because none of Cruz's impairments met or medically equaled the relevant Listings, the ALJ correctly continued to the fourth step of the sequential analysis.

D.    Step Four

At the fourth step, the ALJ must determine the claimant's RFC, or what the claimant is able to do despite any impairment, while considering relevant medical and other evidence from the case record.  20 C.F.R. §§ 404.1545(a)(1), (3).  The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  SSR 96-8p, 1996 WL 374184, at *7 (1996).

Here, the ALJ found that Cruz had the RFC to perform exertionally sedentary work, except that she was limited to "low stress, simple, repetitive tasks performed in an environment with no concentrated exposure to dusts, fumes, gases, and extremes of heat and cold." (R. 16). "Sedentary work involves lifting no more than [ten] pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary." 20 C.F.R. § 404.1567(a). In general, sedentary work should entail no more than two hours of walking or standing or six hours of sitting in an eight-hour workday. SSR 83-10, 1983 WL 31251, at *5 (1983).

1.  ALJ's Assessment of Physicians' Opinions

Cruz asserts that the ALJ erred in his assignment of weight to her treating sources. (Pl.'s Mem. at 11-17). She argues first that Dr. Camille's opinion that she could not work at all should have been granted controlling weight. (Id. at 12-15). As the ALJ noted, however, Dr. Camille's assessment consisted of "a form with boxes checked off" and did not contain any "elaboration or explanation" of the doctor's conclusions. (R. 19). Despite the ALJ's request to Cruz's counsel and his own subpoena to Jacobi Hospital, the record also remains devoid of any records reflecting Dr. Camille's treatment of Cruz over time. Dr. Camille's opinion further was contradicted by other evidence in the record. As the ALJ noted, Dr. Camille's assessment was that Cruz "had poor to no ability to follow work rules, relate to others, deal with work stresses, and maintain attention and concentration." (Id.). Contradicting this assessment, Dr. Camille himself had noted in his

39

August 2011 wellness plan that Cruz was "[a]ppropriately groomed and dressed," that her "thought [processes] and speech [were] logical and coherent," and that she was "cooperative." (Id. at 379). Additionally, although Dr. Bougakov concluded that Cruz was somewhat limited in her ability to maintain a regular schedule, learn new tasks, deal with others and with stress, and maintain attention and concentration, he also found that Cruz could perform simple and complex tasks, make appropriate decisions, and follow and understand simple directions and instructions. (Id. at 313-14). Accordingly, the ALJ's decision not to accord Dr. Camille's opinion controlling weight is supported by substantial evidence in the record.

Cruz also argues that Dr. Astuto's assessment that Cruz was limited by her physical impairments should have been given controlling weight. The ALJ did not assign such weight to Dr. Astuto's opinion, stating that the opinion was "not supported by medical evidence of record." (Id. at 18). Notwithstanding this finding, however, the ALJ's RFC assessment is, in fact, consistent with the vast majority of Dr. Astuto's findings. Dr. Astuto noted that Cruz could not lift more than ten pounds, could never climb, stoop, kneel, balance, crouch, or crawl, and could not work with chemicals, heights, humidity, vibration, moving machinery, temperature extremes, fumes, and dust. (Id. at 388-90). In keeping with these findings, the ALJ limited Cruz's RFC to sedentary work which would not expose her to dusts, fumes, gases, and temperature extremes. (Id. at 16). Indeed, the only issue as to which Dr. Astuto and the ALJ disagreed was the amount of time that Cruz could sit during the day. Dr. Astuto noted that Cruz could sit

40

for no more than two hours in a day, (id. at 389), while the ALJ concluded that Cruz

could sit for up to six hours in a day, and therefore could perform the full range of

sedentary work, (id. at 18).  As the ALJ noted, Dr. Astuto's assessment on this point is

unsupported by other evidence in the record.  Dr. Astuto herself also cites no medical

findings that support this conclusion,  pointing instead only to MRI results that were not

part of the record.  (See id. at 389).  Additionally, Cruz testified that Dr. Astuto treated

her for her asthma and allergies, not for her back or knee problems.  (Id. at 37).  In these

circumstances, the ALJ was not required to give controlling weight to Dr. Astuto's

opinion regarding Cruz's strength and postural capabilities.  See 20 C.F.R.

§ 404.1527(c)(ii).  Moreover, even if Dr. Astuto treated Cruz for back and knee

impairments, her opinions are contradicted by Dr. Revan's findings during the relevant

period that Cruz's gait was normal, that she could squat halfway and was able to walk on

her heels and toes without difficulty, that she did not use assistive devices and was able to

rise from a chair without assistance, and that she had 5/5 strength in her lower

extremities.  (R. 308-09).  In light of these examination findings, the ALJ's decision to

discount Dr. Astuto's opinion plainly was supported by substantial evidence.

   Cruz further contends that the ALJ's decision violates SSR 96-2p, which

requires an ALJ to "make clear to any subsequent reviewers the weight [the ALJ] gave to

the treating source's medical opinion and the reasons for that weight."  (Pl.'s Mem. at

12).  Because the ALJ did not expressly assign a weight to the opinions of Drs. Astuto

and Camille, Cruz contends that "the ALJ gave no weight to [the] opinions of the treating

physician[] and the treating psychiatrist." (Id.).  The ALJ found, however, that Cruz had moderate limitations in the areas of daily living, social functioning, and concentration, persistence, and pace.  (R. 15-16).  Thus, the ALJ found many of the same limitations that Dr. Camille did, but simply disagreed as to their intensity.  Similarly, the ALJ's decision made clear that he adopted many of the limitations that Dr. Astuto found.  (Compare id. at 21 with id. at 390).  The fact that the ALJ declined to assign the opinions of those doctors controlling or significant weight, (id. at 21), in light of the evidence contradicting their conclusory statements, does not mean that he accorded them no weight or failed to explain his reasoning adequately.

In sum, the ALJ's decision not to accord controlling weight to Cruz's treating physicians' opinions did not violate SSR 96-2p or the treating physician rule.

2.    ALJ's Assessment of Cruz's Credibility

Cruz does not directly challenge the ALJ's assessment of her credibility. Regardless, it is clear that this determination is supported by substantial evidence.  As the ALJ noted, although Cruz alleged that she had a disc herniation, the examination performed by Cruz's treating physician and an MRI of Cruz's lumbosacral spine found only a disc protrusion, and a 2009 x-ray showed only facet arthropathy.  (Id. at 36, 311, 388).  Moreover, even though Cruz complained of "severe" and "debilitating" back pain, she also reported that the pain was relieved with the over-the-counter medicine Aleve, a heating pad, and Epsom salts.  (Id. at 20, 306).  Cruz's admitted ability to perform many activities of daily living – such as negotiating public transportation independently, doing

42

laundry, shopping, cooking, watching television, and reading – also belies her allegations

of disability.  (Id. at 155-58, 307, 324, 330, 407).  Furthermore, these activities show that

Cruz was able to concentrate and function at a basic level inconsistent with her

allegations of disability.

       E.     Step Five

           At Step Five, the Commissioner has the burden of proving whether there is

work the claimant can perform based on the claimant's RFC, age, education, and work

experience.  See 20 C.F.R. § 404.1520(a)(4)(v).  The ALJ therefore must determine

whether there are jobs in the national economy that the claimant can perform.  SSR 83-

10, at *4.  If the claimant can perform all or substantially all of the exertional demands of

a rule in the Grids, the Grids direct a conclusion of "disabled" or "not disabled"

depending upon the claimant's specific vocational profile.  SSR 83-11, 1983 WL 31252,

at *1 (1983).  When the claimant can perform less than all of the exertional demands of a

rule in the Grids, a careful analysis has to be made as to the claimant's medical

impairments and the limitations attributable to them.  See SSR 83-10, at *1; Zorilla v.

Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).  The ALJ may request the opinion of a

vocational expert to help determine the extent to which these limitations erode the

unskilled sedentary occupational base.  See Iannopollo v. Barnhart, 280 F. Supp. 2d 41,

50-51 (W.D.N.Y. 2003).

           Here, the ALJ determined that Cruz could perform less than the full range

of sedentary work and was limited to low-stress, simple, and repetitive tasks to be

performed in an environment without concentrated dust, fumes, or gases, or extreme hot

or cold temperatures.  (R. 16, 21).  Because these non-exertional limitations likely would

significantly erode Cruz's occupational base, reliance on the Grids alone would not have

been proper.  Bapp v. Bowen, 802 F.2d 601, 605-07 (2d Cir. 1986).  The ALJ thus

correctly considered the opinion of vocational expert Cestar in determining how these

limitations impeded the performance of Cruz's sedentary work.  (R. 21-22, 43-47).

        Cestar testified that an individual of Cruz's age, education, lack of work

experience, and RFC would be able to work as a clerical worker (DOT 209.587-010:

9,000 local and 109,000 national jobs), an account clerk (DOT 205.367-014:  8,000 local

and 200,000 national jobs), or an assembler (DOT 739.687-026:  2,000 local and 225,000

national jobs).  (Id. at 44).  The ALJ found Cestar's testimony to be consistent with the

information in the DOT and determined that Cruz was "capable of making a successful

adjustment to other work that exist[ed] in significant numbers in the national economy."

(Id. at 22).  There consequently was substantial evidence that there were jobs that existed

in substantial numbers in the national economy that Cruz could perform.

        Cruz contends that Cestar's opinion was qualified by the requirement that a

person with her limitations could not be off task for more than five minutes per hour or

absent more than one day per month, (Pl.'s Mem. at 17; R. 44-45), which, she contends,

means that "full time work is beyond [her] capacity," (Pl.'s Mem. at 17).  This assumes

that the ALJ should have credited Cruz's testimony concerning the intensity of her

symptoms.  Credibility determinations, however, are solely within the ALJ's province so

long as there is substantial evidence supporting his findings.  See Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983); see also Marquez v. Colvin, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013) (federal court must afford great deference to credibility finding of ALJ who "had the opportunity to observe [the claimant's] demeanor while [the claimant] was testifying").  As discussed previously, the ALJ's decision not to credit Cruz's assertions regarding the extent of her limitations is supported by substantial evidence.

Accordingly, ALJ Scheer properly concluded that Cruz was "not disabled" under the Act during the relevant period.

V.    Conclusion

ALJ Scheer properly applied the sequential five-step analysis to conclude that Cruz was not disabled under the Act, and this determination is supported by substantial evidence.  For these reasons, the Commissioner's motion for judgment on the pleadings, (ECF No. 15), should be granted, and Cruz's cross motion, (ECF No. 17), should be denied.

IV.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley and to the chambers of the

undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for extension of time for filing objections must be directed to Judge Pauley. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:      New York, New York
            August 28, 2014

                                    FRANK MAAS
                                    United States Magistrate Judge

Copies to all Counsel via ECF

46